IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:17cr129 |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD TULLY, | ) | |
| | ) | |
| *Defendant.* | ) | |

## STATEMENT OF FACTS

The parties stipulate that allegations contained in the Criminal Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt:

1. Beginning in or around March 2009, and continuing to in or around January 2016, in the Eastern District of Virginia and elsewhere, and within the jurisdiction of the Court, the defendant, RONALD TULLY, did knowingly, unlawfully, and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud the Council of Independent Tobacco Manufacturers of America of money, by means of materially false and fraudulent pretenses and promises.

### A. Council of Independent Tobacco Manufacturers of America ("CITMA")

2. TULLY was associated with the Council of Independent Tobacco Manufacturers of America ("CITMA"), a trade association registered in Virginia and comprised of a number of tobacco and tobacco product manufacturing businesses. CITMA was formed in 2003 for the purpose of representing the interests of those independent manufacturers through lobbying the federal and state legislatures. CITMA maintained its principle office in Richmond, Virginia.

3. CITMA was founded primarily by TULLY and another individual, K.A. Those two individuals remained heavily involved in the day-to-day operations of CITMA throughout the time period described above. CITMA's only paid employee, however, was K.A. CITMA paid K.A. a regular consulting fee and reimbursed him for his CITMA-related expenses.

4. Defendant TULLY, by contrast, was never a paid employee or consultant of CITMA. Instead, TULLY was paid (or reimbursed) for the time he spent working on CITMA's behalf and the expenses he incurred while doing so by the National Tobacco Company, one of CITMA's member businesses and TULLY's longtime employer. Accordingly, TULLY was not entitled to any payment or reimbursement from CITMA.

5. CITMA maintained a bank account at Wells Fargo for the purpose of conducting CITMA's business. TULLY was the signatory on this Wells Fargo account, and maintained physical possession and control of the CITMA checkbook. TULLY also received the account statements for CITMA's Wells Fargo account.

6. CITMA's operating costs were funded by membership dues paid annually by CITMA's member companies. CITMA's member companies mailed their dues checks to the personal residence of one of CITMA's co-founders, K.A., which was located in Mechanicsville, Virginia, within the Eastern District of Virginia.

7. K.A. would thereafter deposit those membership dues into CITMA's Wells Fargo bank account. K.A. would then notify TULLY that the funds had been deposited into CITMA's bank account.

8. As the holder of CITMA's checkbook, TULLY was responsible for writing checks to cover CITMA's expenses, which typically included lobbying fees, meeting expenses, and K.A.'s consulting fees and CITMA-related expenses.

### B. The Scheme to Defraud

9. Beginning in or around March 2009, and continuing to in or around January 2016, in the Eastern District of Virginia and elsewhere, and within the jurisdiction of the Court, the defendant RONALD TULLY knowingly and deliberately executed a scheme and artifice to defraud CITMA, by means of materially false and fraudulent pretenses and promises.

10. Specifically, TULLY used his access to the CITMA checkbook and bank account – by virtue of his position as the holder of the CITMA checkbook and the signatory on CITMA's Wells Fargo bank account – to write checks drawn on the CITMA account made payable to himself. TULLY thereafter deposited the proceeds of those CITMA checks into bank accounts that TULLY controlled, and spent the money for his own purposes. After TULLY created a one-man consulting company named TNV Ventures in or about August 2015, TULLY also wrote checks drawn on the CITMA account and made payable to TNV Ventures. TULLY would likewise deposit the CITMA funds he received from the TNV Ventures checks into bank accounts that he controlled, and thereafter used those funds for his own purposes.

11. When presenting those checks to Wells Fargo for payment, TULLY described the purpose of the checks – by way of description on the memorandum line of each check – as constituting either reimbursement for his CITMA-related travel expenses or CITMA-related meeting expenses. In fact, TULLY had either not incurred any such expense, or if he had, knew that he had been or would be reimbursed by his employer, NTC, for the same.

12. TULLY wrote checks payable to himself for (1) purported expenses for CITMA meetings that had occurred, but for which the related expenses had already been paid by another individual; (2) purported expenses for CITMA meetings which had not actually taken place; (3) travel expenses for CITMA-related travel that TULLY had in fact taken, but for which TULLY

3

had been reimbursed by his employer, NTC; (4) purported travel expenses for CITMA-related travel when in fact the travel in question was unrelated to any CITMA activities or purpose; and (5) payment for consulting fees for TULLY's company, TNV Ventures, when in fact CITMA had never contracted for services from TNV Ventures and TULLY had been paid for his CITMA-related efforts by NTC.

13. In each instance, TULLY deposited the proceeds of those CITMA checks into bank accounts that he controlled, and thereafter spent those CITMA funds for his own purposes. At all times, TULLY acted with the intent to defraud CITMA.

14. TULLY's position as the checkbook holder for the CITMA account required him to draft legitimate checks on the CITMA account in order to pay CITMA's operating expenses. TULLY would often mail those CITMA checks to various entities and individuals through the mails, thereby fulfilling the only permissible purpose for which TULLY was to utilize the CITMA checkbook. In providing those necessary payments or reimbursement to CITMA's creditors, TULLY was able to project the appearance that TULLY was using his control of the CITMA account for only authorized and legitimate ends, limiting the likelihood that there would be any investigation into TULLY's management of the CITMA account that would disrupt TULLY's ability to continue to draft fraudulent checks on the CITMA account.

15. In order to advance, further, and carry out the above-described scheme and artifice to defraud, TULLY knowingly caused to be delivered by the mails a number of mailings that contained CITMA checks to the places which those mailing were directed to be delivered by the individuals to whom the mailings were addressed.

16. Specifically, on or about July 22, 2014, for the purpose of advancing, furthering, or carrying out the above-described scheme and artifice to defraud, TULLY knowingly caused to be

delivered, by US mail or a private and commercial interstate carrier, a mailing containing a check written by TULLY and drawn on CITMA's Wells Fargo bank account, addressed to the Mechanicsville, Virginia home address of K.A. That check, drafted for $55,034 and made payable to K.A., constituted reimbursement – from CITMA – to K.A. for K.A.'s CITMA-related consulting fees and expenses. K.A. had directed that TULLY mail this payment to K.A. at K.A.'s Mechanicsville, Virginia home address.

17. During the course of TULLY's scheme to defraud, TULLY obtained $833,599.93 from CITMA by means of materially false and fraudulent pretences and promises. Accordingly, the parties agree that the actual and intended loss attributable to TULLY is $833,599.93.

18. The actions taken by the defendant as described above were taken willfully and knowingly. The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law.

19. This Statement of Facts only includes those facts necessary to establish the defendant's guilt as to the offenses to which he is entering a guilty plea. It does not necessarily reference all information known to the government or the defendant about the criminal conduct at issue.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____
Thomas A. Garnett
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between myself and the United States, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Ronald Tully
Defendant

I am Ronald Tully's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Thomas T. Cullen, Esquire
Counsel for Defendant